_____
                              )
**ELVIRA HARGROW,**            )
                              )
        **Plaintiff**          )
                              )
        **v.**                )        **Civil Action No. 13-10170-DJC**
                              )
**CAROLYN W. COLVIN,**[1]    )
**Commissioner,**             )
**Social Security Administration,**  )
                              )
        **Defendant.**       )
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                      **March 18, 2014**

### I.    Introduction

Plaintiff Elvira Hargrow ("Hargrow") filed claims for disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration. Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Hargrow brought this action for judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on November 23, 2011, denying her claim. Before the Court are Hargrow's motion to reverse and the Commissioner's motion to affirm that decision. In her motion, Hargrow claims that the ALJ erred in denying her claim because: (1) the ALJ failed to consider a closed period of disability; (2) the ALJ failed to find that her attention deficit hyperactive disorder ("ADHD")

---

[1] During the pendency of this litigation, Ms. Colvin became the Acting Commissioner of the Social Security Administration. The Court, therefore, substitutes Ms. Colvin as the defendant in this matter. Fed. R. Civ. P. 25(d).

was a medically determinable impairment; (3) the ALJ improperly discounted the opinion of her treating psychiatrist without a reasonable basis; and (4) the ALJ failed to account for and resolve an inconsistency in the testimony of a Vocational Expert ("VE"). For the reasons explained below, the Court GRANTS the Commissioner's motion to affirm and DENIES Hargrow's motion to reverse.

## II.     Factual Background

Hargrow was born on August 8, 1964 and was forty-five years old when she applied for SSDI and SSI benefits in April 2010. R. 61-62.[2] In her applications filed with the Social Security Administration ("SSA"), she alleged disability, beginning on February 1, 2008, due to a mood disorder and ADHD and reported having ceased working in September 2008. R. 117-130, 146.

## III.     Procedural Background

Hargrow filed claims for SSDI and SSI benefits on April 26, 2010. R. 61-62. After initial review, the SSA denied her claims on July 26, 2010. R. 65-70. Upon reconsideration, the claims were again denied on December 13, 2010. R. 74-79. On December 15, 2010, Hargrow filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 80-81. A hearing was held before an ALJ on October 6, 2011. R. 29-60. In a written decision, dated November 23, 2011, the ALJ found that Hargrow was not disabled within the definitions of the Social Security Act and denied her claims. R. 8-24. Hargrow filed a request for review of this decision on January 23, 2012. R. 5-7. On November 27, 2012, the Appeals Council denied the request to review Hargrow's claim, rendering the ALJ's decision the Commissioner's final decision. R. 1-3.

---

[2] "R." refers to the administrative record that is entered at D. 12.

**IV. Discussion**

**A.  Legal Standards**

*1.  Entitlement to Disability Benefits and Supplemental Security Income*

A claimant's entitlement to SSDI and SSI turns in part on whether she has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505.  The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The Commissioner must follow a five–step process when she determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted.  20 C.F.R. §§ 404.1520, 416.920.  The determination of disability may be concluded at any step during the process.  Id.  First, if the applicant is engaged in substantial gainful work activity, then the application is denied.  Id.  Second, if the applicant does not have, or has not had within the relevant time period, a severe medically determinable impairment or combination of impairments, then the application is denied.  Id.  Third, if the impairment or combination of impairments meets the conditions for one of the "listed" impairments in the Social Security regulations, then the claimant is considered disabled and the application is granted.  Id.  Fourth, if the applicant's "residual functional capacity" ("RFC") is such that she can still perform past relevant work, then the application is denied.  Id.  Fifth, if the

applicant, given her RFC, education, work experience, and age, is unable to do any other work, the claimant is considered disabled and the application is granted.  Id.

       2.     *Standard of Review*

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation mark omitted).  The ALJ's findings of fact, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen, 172 F.3d at 35 (citations omitted).  Thus, if the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard.  See 42 U.S.C. § 405(g).

**B.**    **Before the ALJ**

       1.     *Medical History*

There was extensive evidence before the ALJ about Hargrow's medical history, particularly relating to the conditions Hargrow relied upon in applying for SSDI and SSI benefits. R. 13-24. The ALJ also considered impairments related to substance abuse. Id.

a. Mood Disorder and Polysubstance Dependence

Hargrow alleged disability, beginning on February 1, 2008, due to a mood disorder and ADHD. R. 117-130, 146. On April 6, 2008, Hargrow was admitted to McLean Hospital ("McLean") for treatment related to alcohol and cocaine abuse. R. 203. During intake, Hargrow reported stress from extreme conflict in her living situation and described family tensions resulting from her substance abuse. R. 205, 352. Hargrow reported suicidal ideation during the prior weeks and revealed that she had cut her wrists in an incident four to five years prior to her hospital admission. R. 349, R. 376. Hargrow expressed current suicidal ideation, but noted that it had begun that day and was no longer present because she was getting help. R. 205. She detailed a history of alcohol and cocaine abuse and reported that she would hear "the devil's voice inside [her] head" telling her it was okay to use drugs and alcohol. R. 205-06.

During a mental status examination conducted during Hargrow's admission, she was observed to have a "full affect with slight inappropriate humor/laughing at times." R. 207, 357. She was diagnosed with alcohol dependence, cocaine dependence and a mood disorder not otherwise specified ("NOS"). R. 207. Hargrow was assigned a Global Assessment of Functioning ("GAF") score of approximately 30.[3] R. 208. The next day, she was discharged

_____

[3] The Global Assessment of Functioning scale measures social, occupational, and psychological functioning of adults. A GAF score in the 21-30 range indicates that an individual's behavior is considerably influenced by delusions or hallucinations, or indicates serious impairment in communication or judgment, or indicates an inability to function in almost all areas. See Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed. Text Revision 2000) ("DSM-IV-TR").

from McLean and was advised to seek psychotherapy and treatment for her substance abuse issues. R. 203. During discharge, Hargrow's condition was observed to be slightly improved and she did not appear to be depressed. Id. She was assigned a GAF score of 45.[4] Id.; R. 394.

On February 18, 2010, Hargrow was assessed by Lindsay Ervin, a licensed clinical social worker, at the North Suffolk Mental Health Association. R. 228. Hargrow described experiencing frequent mood swings and angry outbursts and reported difficulty concentrating and staying on task. Id. Ervin diagnosed ADHD NOS and cocaine and alcohol dependence in full remission. Id. Ervin assigned Hargrow a current GAF score of 65, with a twelve month high of 70 and a twelve month low of 55.[5] Id. She noted that Hargrow presented with a bright affect and mood and appeared motivated, yet easily distracted. R230. On February 25, 2010, Hargrow attended an outpatient counseling session with Ervin and reported irritability, agitation, distraction and difficulty completing tasks. Id.

During a session in March 2010, Hargrow reported ongoing frustration and that she felt overwhelmed and angry. R. 231. Ervin noted that she appeared scattered and manic. Id. On April 1, 2010, Hargrow informed Ervin that "things are going well." R. 231. She reported that she was easily frustrated but was able to stop herself from overreacting and wanted to find a job. Id. On April 22, 2010, Hargrow again stated that "things are going well" and reported finding new ways to deal with her son's behavioral issues. R. 232. Ervin noted that Hargrow's mood was within normal limits. Id.

---

[4] A GAF score in the 41-50 range indicates serious symptoms or any serious impairment in social, occupational, or school functioning. See DSM-IV-TR.

[5] A GAF score in the 61-70 range indicates that one has some mild symptoms or some difficulty in social, occupational or school functioning, but generally functions pretty well and has some meaningful relationships. See DSM-IV-TR.

On May 11, 2010, Hargrow was evaluated by Dr. Salin Dahlben of the North Suffolk Mental Health Association. R. 235. Hargrow reported "no anxiety or visual hallucinations" and "denie[d] suicidal or homicidal ideations." Id. Dr. Dahlben ruled out bipolar disorder, diagnosed a mood disorder NOS and a personality disorder NOS and prescribed mood stabilizing drugs. R. 235-236.

Hargrow rescheduled an outpatient therapy appointment planned for May 2010. R. 232. She attended a therapy session on June 3, 2010 and reported to Ervin that she was taking mood stabilizers but explained that they made her feel angrier. R. 233. Hargrow stated that she continued to feel disorganized, irritable and unable to concentrate or focus. Id. Ervin noted that Hargrow had difficulty focusing during this session. Id. On June 10, 2010, Hargrow informed Dr. Dahlben that she stopped taking the mood stabilizers after two weeks because she felt sedated. R. 237. She also reported that she wanted to get pregnant and was worried about taking the drugs. Id. Dr. Dahlben wrote Hargrow new prescriptions for mood stabilizing drugs. Id. Hargrow met with Dr. Dahlben again on July 8, 2010 and her medications were adjusted. R. 268. She did not report for or call to cancel an appointment scheduled for August 5, 2010. Id. During a meeting the following week, Dr. Dahlben noted that Hargrow had been taking her prescribed drugs erratically because she reported that they were "not helping." R. 269. During their next meeting on September 2, 2010, however, Hargrow reported less frequent and less intense symptoms. R. 270.

Hargrow filed a Disability Report Appeal with the SSA on August 24, 2010 and reported that she had begun experiencing panic attacks in crowded places in May 2010. R. 176. In October 2010, Hargrow was examined by Dr. Eleanor Janeway of the Windsor Street Health

Center and described symptoms of anxiety and agoraphobia and reported having experienced panic episodes on buses and trains. R. 274. Dr. Janeway instructed Hargrow to contact her psychiatrist to schedule an appointment to discuss those symptoms. R. 275.

During a session on December 16, 2010, Ervin completed an Outpatient Treatment Plan Update form related to Hargrow's therapy. R. 419. Ervin noted that Hargrow had withdrawn from therapy in July and had discontinued taking medication and attending appointments. Id. Hargrow reported increased agitation, outbursts, guilt and shame. Id. She also described a recent episode involving alcohol abuse. Id. Ervin noted that Hargrow's mental status was within normal limits and assigned a current GAF score of 60, with a twelve month high of 70 and twelve month low of 55. Id. She diagnosed a mood disorder NOS and a personality disorder NOS. Id. During a January 2011 therapy session, Hargrow reported having no patience and no ability to compromise when angry. R. 412. Ervin noted that Hargrow was "hyper but redirectable [and] able to focus." Id. Hargrow did not appear for a January 2011 appointment with Dr. Dahlben or a February 2011 therapy session. R. 412, 417.

On March 3, 2011, Hargrow met with Dr. Dahlben and reported that she lacked the desire to leave her house. R. 416. He noted that Hargrow was able to respond to instructions related to "calming down." Id. Hargrow cancelled the therapy session scheduled for March 2011. R. 411. On March 29, 2011, Hargrow informed Dr. Dahlben that she was still anxious about things but felt less irritable and had "much better" self control. R. 415.

On April 28, 2011, Hargrow met with Dr. Dahlben and reported that she had not taken her medication during the previous four weeks and had resumed drinking. R. 414. She informed him that she still had her prescription from their last meeting and that she had not been attending

therapy sessions.  Id.  Dr. Dahlben encouraged Hargrow to resume medication and therapy sessions as soon as possible and noted that she should contact 911 or otherwise seek medical assistance if necessary.  Id.  Hargrow did not appear for or cancel an appointment scheduled for May 17, 2011.  Id.  During a May 25, 2011 meeting, Hargrow reported improvement, except for daytime tiredness, and informed Dr. Dahlben that she was "no longer irritable or flipping out on people."  R. 413.  He noted that Hargrow had a more appropriate affect at that time.  Id.

On June 8, 2011, Hargrow resumed therapy with Ervin.  R. 411.  Ervin discussed with Hargrow her commitment to the therapy since she had not reported for a session since January.  Id.  Hargrow declined Ervin's offer to see another therapist during Ervin's upcoming maternity leave and was referred to support groups.  Id.  On June 21, 2011, Hargrow reported to Dr. Dahlben that things were better at home.  R. 410.  On July 26, 2011, she reported that she was still having issues with self-control, but was feeling better and less panicky.  R. 409.

b.  Attention Deficit Hyperactivity Disorder

During the initial assessment at North Suffolk Mental Health Association on February 18, 2010, licensed clinical social worker Ervin diagnosed Hargrow with ADHD and cocaine and alcohol dependencies in full remission.  R. 226-28.  On March 23, 2010, Ervin completed the Health Care Certification portion of the Work History Report, documenting that ADHD and a mood disorder were Hargrow's disabilities.  R. 161-162.

In November 2010, Caroline Cole, a state agency psychologist, reviewed the available record and completed a Psychiatric Review Technique form ("PRT") and a Mental Residual Functional Capacity Assessment form ("MRFC").  R. 326-43.  Dr. Cole's PRT made note of ADHD and the MRFC assessment indicated that the medical evidence of record supported

ADHD. R. 327, 342. However, Dr. Cole expressed that Hargrow's claims were only "partially credible," noting that Hargrow's therapist had diagnosed ADHD while her psychiatrist had diagnosed a mood disorder NOS and a personality disorder NOS. R. 338.

### c. Assessments Regarding Mental Impairments

On July 12, 2010, Lisa Fitzpatrick, a state agency psychologist, reviewed the available record and completed a PRT form. R. 238-51. Dr. Fitzpatrick determined that Hargrow was impaired by an affective disorder NOS and substance addiction disorders. Id. She indicated that the impairments were severe, but were not expected to last twelve months. Id. Assessing Hargrow's functional limitations, Dr. Fitzpatrick determined that the impairments would create moderate restrictions in activities of daily living and that Hargrow would have moderate difficulty in maintaining social functioning and maintaining concentration, persistence, or pace. R. 248. She found that Hargrow had experienced no episodes of decompensation due to her impairments. Id. In making these determinations, Dr. Fitzpatrick noted that "[Hargrow]'s impairment is severe, but not expected to last 12 [months] with continued [therapy]." R. 250. Dr. Fitzpatrick indicated that the impairments could reasonably be said to have existed as of November 2009, three months prior to the time Hargrow initiated therapy, but that there was insufficient evidence to determine impairment prior to that time period. Id.

On November 5, 2010, Dr. Cole completed a PRT form and a MRFC assessment. R. 326-43. Dr. Cole determined that Hargrow was impaired by ADHD, a mood disorder NOS and substance addiction disorders. Id. She noted that Hargrow had made allegations of mood swings and ADHD and had reported experiencing panic attacks for one year. R. 338. After summarizing the relevant medical evidence, Dr. Cole stated that Hargrow's allegations of

impairment were partially credible, noting that ADHD had not been diagnosed by her treating psychiatrist and that her therapy session notes included no complaints of panic attacks or anxiety. Id. She opined that Hargrow's ability to travel in unfamiliar places or use public transportation would not be significantly limited. R. 341. Assessing functional limitations, Dr. Cole determined that Hargrow's impairments would create mild restrictions in activities of daily living and that she would have moderate difficulty in maintaining social functioning and in maintaining concentration, persistence, or pace. R. 336. Dr. Cole found that Hargrow had experienced no episodes of decompensation as a result of her impairments. Id.

In the MRFC assessment, Dr. Cole evaluated Hargrow's functional abilities in consideration of the impairments supported by the record – ADHD, mood disorder and polysubstance dependence in remission. R. 340-342. She indicated that Hargrow's ability to remember locations and work-like procedures and her ability to understand, remember and carry out very short and simple instructions would not be significantly limited by her impairments. R. 340. Further, Dr. Cole determined that Hargrow's ability to perform activities within a schedule, maintain regular attendance, sustain an ordinary routine without special supervision, work with or near others without being distracted, and make simple work-related decisions would not be significantly limited. Id.

Dr. Cole determined that Hargrow's ability to understand, remember and carry out detailed instructions and ability to maintain attention and concentration for extended periods would be moderately limited. Id. She also concluded that Hargrow would experience some moderate limitations in social interaction. R. 341. She indicated that the impairments would not significantly limit Hargrow's ability to "complete a normal work-day and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Id. Dr. Cole determined that Hargrow would be able to understand and remember simple instructions, complete simple and repetitive tasks and function for a two hour span during an eight hour day, five days per week. R. 342.

On September 22, 2011, Dr. Dahlben completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) form. R. 422-23. Lindsay Ervin appears to have signed this form as well. Id. Dr. Dahlben diagnosed mood disorder NOS, ruled out bipolar disorder, and noted past substance abuse (alcoholism) with periodic relapses. Id. He noted that Hargrow reported anger, agitation, diminished concentration and attention, and interpersonal difficulty. Id. Based on these findings, Dr. Dahlben determined that Hargrow would have marked difficulty in the following work related capacities: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration sufficient to perform work tasks throughout an eight hour work day; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ability to complete a normal work day and work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors. Id.

During an administrative hearing on October 6, 2011, the ALJ heard testimony from Hargrow and her husband, Anthony James Hargrow, and vocational expert ("VE") Christopher K. Wood.  R. 29-60.

a.    <u>Hargrow's Testimony</u>

Hargrow testified that she did not suffer from any physical impairment, but was mentally impaired by anxiety, bipolar disorder and ADHD.  R. 35-36.  She testified that she was not currently working and that, during the previous ten to fifteen years, she had not lasted at any job for more than a few months.  R. 35.  She stated she had left a job as a prep cook after a week or so because of her anxiety and inability to follow directions or be around other workers and had left a cashier position after approximately two months because of anxiety and an inability to get along with people.  R. 36-37.  Hargrow testified that anxiety had always had an effect on her and that she would "self-medicate" through drug use.  R. 37.  She stated that she used drugs for "fourteen years off and on" and started "getting clean in 2008," though she had experienced a relapse in January 2009.  R. 38.  She testified that her mental impairments had become more problematic since discontinuing drug use.  R. 37-38.

Hargrow testified that she had been seeing Dr. Dahlben and Ervin for treatment of her anxiety for almost two years.  R. 38.  She reported that she saw each of them monthly, but noted that she had not recently met with Ervin because the social worker was on maternity leave.  R. 43.  Hargrow stated that she did not feel that the medication she had been prescribed was helpful, noting that "there are days it works and there are days it doesn't."  R. 39.  She testified that the medication made her dizzy, drowsy and lethargic and that she had trouble focusing and

concentrating on tasks.  R. 39-40.  Hargrow testified that she hadn't been able to take a bus since 2009 because of her anxiety, noting that she would walk about a mile to go grocery shopping to avoid the bus system.  R. 40-41, 44.  She reported that she had been unsuccessful in multiple attempts to prepare for the GED test because she was unable to focus.  R. 41-42.

### b.  Anthony James Hargrow's Testimony

Hargrow's husband testified that he married Hargrow in January 2010 and currently lived with her.  R. 45-46.  He described Hargrow as "very angry," "very manic" and "all over the place."  R. 45.  He testified that he had once left the home for a period of months because of Hargrow's anger issues.  R. 46.  He testified that Hargrow did not like to leave the house and would often cancel appointments with her doctors.  R. 47.  He stated that his frequent attempts to coax Hargrow to go out were usually unsuccessful.  Id.  He also testified that she had difficulty completing tasks around the home without assistance from him.  R. 47-48.

### c.  VE's Testimony

At the administrative hearing, the ALJ presented a hypothetical to vocational expert Christopher Wood:

> "Let me ask you to assume we're talking about a person who is 47 years old, 11th grade education.  Let's assume this person has no past relevant work and let's assume this person could perform work without any exertional, postural, or environmental limitations.  Let's assume this person could understand and remember simple instructions.  Let's assume this person could concentrate for two-hour periods over the course of an eight-hour workday.  Let's assume this person could interact appropriately with coworkers and supervisors, but should avoid work which requires close coordination or teamwork with coworkers, and should avoid work which requires frequent contact with the general public.  Let's assume this person could adapt to routine change in the work setting.  With [these] abilities and limitations, are there jobs in the national or regional economy such a person could perform?"  R. 48-49.

The VE testified that a person with those capabilities would be able to engage in light, unskilled work involving "one-two step instructions, concentrating for two hours, no significant interaction with coworkers or teamwork and no contact with the public." R. 49. The VE testified that such a person would be capable of work in jobs such as a cafeteria attendant or a laundry worker. Id.

The ALJ then altered his hypothetical, offering that the previously described individual "would be unable to maintain concentration, persistence or pace over an eight-hour workday such that this person would be off-work task greater than 20 percent of the eight hour workday" and inquired whether that individual would be able to perform either of the jobs on a full-time basis. R. 50. The VE testified that the altered hypothetical would not change his opinion that the individual would be able to perform those jobs on a full time basis. Id.

During examination by Hargrow's attorney, the VE testified that an individual unable to carry out instructions as a part of her job for two-thirds or more of the workday would not be able to perform the two job functions he had identified. R. 51-52. He also testified that both jobs have a reasoning level of two as described in the Dictionary of Occupational Titles ("DOT"), involving an "applied common sense understanding to carry out detailed but uninvolved writ[ten] or oral instructions, deal with problems involving a few concrete variables, in or from standardized instructions." R. 56-57.

### 3. Findings of the ALJ

Following the five–step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Hargrow had not engaged in substantial gainful activity since February 1, 2008. R. 13. Hargrow does not dispute the ALJ's finding at step one.

At step two, the ALJ found that Hargrow had the following severe impairments: "mood disorder NOS; polysubstance dependence (reportedly in remission since 7/10)." Id. The ALJ concluded that Hargrow's ADHD was not a medically determinable impairment. Id. Hargrow contends that the ALJ erred in this finding. D. 16 at 2.

At step three, the ALJ found that Hargrow did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 14. Before reaching step four, the ALJ determined Hargrow's RFC, finding that Hargrow:

> "has the residual functional capacity to perform a full range of work at all exertional levels. The claimant could understand and remember simple instructions and could concentrate for two-hour periods throughout an eight-hour workday on simple tasks. The claimant could interact appropriate[ly] with coworkers and supervisors, but should avoid work that requires close coordination or teamwork with coworkers and should avoid work that requires frequent contact with the general public. The claimant could adapt to routine changes in the work setting."

R. 16. The ALJ determined that although Hargrow's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Hargrow's statements as to the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC assessment. R. 21.

At step four, The ALJ determined that Hargrow had no past relevant work, despite the indication of substantial gainful activity during a number of the most recent fifteen years. R. 23.

At step five, the ALJ found that after considering Hargrow's age, education, work experience and RFC, there were jobs in significant numbers in the national economy that Hargrow could still perform and that, therefore, Hargrow was not disabled. R. 23-24. Hargrow

disputes the finding at step five, arguing that the ALJ did not resolve a conflict between the VE's testimony and the information included in the DOT. D. 16 at 9-12.

### C. **Hargrow's Challenges to the ALJ's Findings**

Hargrow contends that the ALJ erred by (1) failing to consider a closed period of disability between early 2008 and Dr. Cole's Assessment in November 2010 or between July 2010 and the ALJ's decision in November 2011; (2) finding that ADHD was not a medically determinable impairment; (3) granting more weight to Dr. Cole's opinion than to the opinion of her treating psychiatrist, Dr. Dahlben; and (4) relying upon and not resolving a conflict in the testimony of the VE. For the reasons explained below, these arguments fail.

>    *1.     The ALJ Considered the Entire Period of Alleged Disability and his Findings Are Supported by Substantial Evidence*

Hargrow argues that the ALJ erred by failing to consider a closed period of disability between her alleged onset date in February 2008 and Dr. Cole's assessments in November 2010. D. 16 at 4. She states that the ALJ's primary reliance on Dr. Cole's assessments was improper because the assessments were for a "current" period and could not provide sufficient evidence for the ALJ to evaluate Hargrow's disability throughout the relevant period. Id. She argues that the evidence relating to her treatment at McLean Hospital in April 2008 – specifically her GAF scores of 30 upon admission and 45 upon discharge – indicate the severity of her functional impairments at that time. D. 16 at 4-5.[6] Hargrow argues further that Dr. Dahlben, her treating psychiatrist, determined that she had severe impairments dating to February 1, 2008 at the latest, and that his opinion is uncontroverted up to the point of Dr. Cole's November 2010 assessments. Id. at 5. She argues that the record supports, at least, "some period" of marked impairment

---

[6] To the extent that Hargrow argues that it was improper for the ALJ to consider the GAF scores in the record, D. 21 at 3 n. 1, the Court rejects this argument. See D. 23 at 1-3.

beginning in early 2008.  Id.  She contends that Dr. Fitzpatrick's determination that her mental impairments were severe and that the medical onset could reasonably be set as November 2009 further supports this inference.  D. 21 at 1.

Hargrow also claims that the ALJ failed to consider the medical records for the period between July 2010 – which she cites as the last month considered by Dr. Cole in her PRT and MRFC assessments – and the ALJ's decision in November 2011.  Id. at 3.  She argues that Dr. Dahlben's determination that she was still markedly impaired in several functional areas in September 2011 further supports the inference that she had experienced a period of marked impairment that continued for more than twelve months and that the ALJ's failure to consider a closed period of disability constituted reversible error.  Id.; D. 16 at 6.

### a.) Dr. Cole's Assessments

In making his findings, the ALJ gave great weight to Dr. Cole's assessments.  R. 21. Hargrow's argument that the ALJ's reliance on these assessments constitutes error because they included only a "cursory review of the medical record" and because they were "current" assessments, while Hargrow's impairments persisted throughout the entire alleged period of disability, D. 16 at 4; D. 21 at 3, is not supported by the record.

Dr. Cole completed PRT and MRFC forms on November 5, 2010, R. 326-43, although the PRT form states an assessment period of "02/01/2008 to 03/31/2008, 11/05/2009."  R. 326.[7] Under "Medical Disposition" on the form, Dr. Cole indicated that an RFC Assessment was necessary and that the record contained "Insufficient Evidence," R. 326, which reflected that there was no medical record for the time period of February 1, 2008 (Alleged Onset Date)

---

[7] The Court notes that although the assessment period listed was through 11/05/2009,  the form was completed on November 5, 2010 and reflects that Dr. Cole reviewed Hargrow's 2010 medical records.  R. 338.

through March 31, 2008 (Date Last Insured), leaving insufficient evidence for her to make a determination regarding Hargrow's Title II disability claim.  R. 338.

It is true that Dr. Cole's MRFC form is labeled as a "Current Evaluation."  R. 340. Hargrow argues that this indication is an acknowledgement that the assessment was probative only for the time period contemporaneous with the completion of the assessment, November 2010.  D. 16 at 8-9.  This contention, however, is belied by the form itself, which indicates that Dr. Cole reviewed Hargrow's medical records from March 2008 through 2010 (R. 338) and the protocol for a doctor to complete the header on the form.  See Program Operations Manual System ("POMS") DI 24510.050 (instructing an individual completing the physical RFC assessment form is instructed to mark the "Current Evaluation" block when the evaluation covers the period between the alleged onset date and the current date); POMS DI 24510.062 (instructing individual completing the heading of the MFRC form to obtain the heading information from the PRT form and the claim folder).

Because non-examining sources lack the benefit of an in-person examination or treatment relationship with a claimant, their opinions can be given weight only to the extent that they "provide supporting explanations for their opinions."  20 C.F.R. § 404.1527.  Hargrow cites cases in which the opinions of non-examining sources, consisting of brief, conclusory statements did not amount to substantial evidence and were not afforded significant weight.  D. 21 at 4 (citing Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)); Ormon v. Astrue, No. 11-21-7, 2012 WL 3871560, at *84 (1st Cir. Sept. 7, 2012)).  Dr. Cole's assessments are not the type of brief, conclusory statements to which Hargrow refers.  See Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (distinguishing reports containing "little more than

brief conclusory statements or the mere checking of boxes" which are "accordingly [ ] entitled to relatively little weight" from reports that reference and state a medical conclusion for each of claimant's alleged impairments, indicating that a non-treating source has reviewed the medical records with "some care").  Dr. Cole's assessment included a review of all available medical records, consideration of Hargrow's self-report of impairments and limitations, and an opinion based on her review of the entire record.  R. 338.  Despite Hargrow's characterization of Dr. Cole's assessments as based on a "cursory review" of the record, D. 21 at 3, her opinion was supported by explanation and appropriate for full consideration by the ALJ.  20 C.F.R. § 404.1527(e).

b.) *The ALJ's Evaluation*

The ALJ's detailed discussion of Hargrow's medical record and the testimony at the administrative hearing, indicates that he considered the entirety of the record and entire period of alleged disability and concluded that Hargrow's impairments did not amount to disabilities and, therefore, denied her benefits.  R. 8-22; 20 C.F.R. §404.1520; 20 C.F.R. §416.920.  Accordingly, this Court concludes that the ALJ's decision was supported by substantial evidence and was not in error.

The ALJ considered Hargrow's 2008 treatment at McLean Hospital, noting the significance of her GAF scores at that time.  R. 16-17.  He provided a detailed description of Hargrow's treatment at the North Suffolk Mental Health Association in 2010 and 2011.  R. 17-20.  Those treatment records indicated that, despite inconsistent compliance with medication and therapy regimens, Hargrow experienced only mild to moderate mental limitations during that period.  Id.  The ALJ considered the assessments of Dr. Fitzpatrick and Dr. Cole.  R. 18-19.  He

also considered and discussed the records (and assessment in September 2011) from Dr. Dahlben and social worker Ervin and, finally, the testimony at the October 2011 administrative hearing. R. 20-21.

While acknowledging the severity of Hargrow's impairment during her April 2008 treatment at McLean Hospital, the ALJ pointed to Hargrow's failure to seek follow-up treatment, as she was advised to, and to the fact the she had no other instances of emergency treatment as indications that her condition had not remained as severe as she asserted throughout the period of alleged disability. R. 22; see 20 C.F.R. §§ 404.1530, 416.930; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (noting that an absence of treatment records can be viewed as "evidence" from which an ALJ can infer that the severity of a claimant's impairment was not as intense as alleged); Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 534 (1st Cir. 1988) (citing 20 C.F.R. §§ 404.1530, 416.930 and noting that a failure to follow prescribed treatment without "good reason" can be basis for denial of a disability claim). This analysis evidenced, contrary to Hargrow's contention, that the ALJ considered the closed period of time between 2008 and Hargrow's initial assessment at North Suffolk Mental Health Association in February 2010. The ALJ's determination that Dr. Cole's assessments, based upon medical records covering 2008 through 2010, were consistent with the record also shows his consideration of that period. R. 21. Finally, The ALJ's discussion of Hargrow's treatment records from the North Suffolk Mental Health Association, R. 18-20, including treatment and assessment by Dr. Dahlben and Ervin, indicates his consideration of the closed period between July 2010 and his decision in November 2011.

Hargrow argues that Dr. Dahlben's medical opinion, which covered February 2008 through September 2011, is uncontroverted between early 2008 and November 2010, D. 16 at 5, and between July 2010 and September 2011, D. 21 at 4. She argues that an "ALJ is not free to reject uncontradicted evidence." D. 16 at 5. While Hargrow is correct to note that an ALJ may not "ignore medical evidence and substitute his own views for uncontroverted medical opinion," Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.1999), her argument fails because Dr. Dahlben's opinion was not uncontradicted, as the ALJ noted through his discussion of the medical and other evidence in the record conflicting with her opinion. D. 21-22 (ALJ noting that he was giving Dr. Dahlben's opinion "lesser weight" because Hargrow did not see the doctor or Ervin until approximately two years after McLean Hospital stay in April 2008, but Dr. Dahlben's opinion stretched back to February 2008; and the doctor's opinion was not consistent with the treatment record even for the period in which the doctor had treated Hargrow). It is for the ALJ, in his capacity as designee of the Commissioner, to weigh conflicting evidence, see Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001) (citing Walker v. Bowen, 834 F.2d 635, 639–40 (7th Cir. 1987)), and that is what the ALJ did here.

Hargrow also claims that, despite purporting to put "great weight" on the opinion of Dr. Cole, the ALJ committed error by straying from that opinion when making his RFC determination. D. 21 at 4. She argues that Dr. Cole concluded that Hargrow would be able to concentrate for a single two hour span during an eight hour workday, rather than multiple periods, as the ALJ determined in his RFC assessment. Id.

In Section I of the MRFC, "Summary Conclusions," Dr. Cole evaluated twenty of Hargrow's mental function activities "within the context of the individual's capacity to sustain

that activity over a normal workday and workweek, on an ongoing basis." R. 340-41; POMS DI 24510.060. Section III, "Functional Capacity Assessment," includes Dr. Cole's actual MRFC assessment, consisting of "summary conclusions in narrative form" related to all mental capacities and limitations that were assessed in Section I, and contains the statement to which Hargrow refers: "claimant will be able to carry out simple, repetitive tasks and be [able] to attend for a 2 hour span during an 8 hour day 5 days a week." R. 342; POMS DI 24510.060.

This narrative summarizes the conclusions reached in Section I, which assessed Hargrow's mental capacities in the context of her ability to sustain them throughout "a normal workday and workweek "and, accordingly, are not an indication by Dr. Cole that Hargrow would be able to function for only a single two hour period during a standard work day. R. 340-42. In particular, with regard to sustained concentration and pace, she indicated that Hargrow's ability to "complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" would not be significantly limited by her impairments. R. 341.

Moreover, the ALJ made clear that his RFC determination was made in consideration of the entire record, R.16, including but not limited to Dr. Cole's assessment that Hargrow's functional limitations would create only mild restrictions in activities of daily living and moderate difficulty in maintaining social functioning and in maintaining concentration, persistence, or pace. R. 336. Importantly, an ALJ need not "adopt the entirety of a doctor's RFC, especially a nontreating source." Aho v. Comm'r of Soc. Sec. Admin., CIV.A. 10-40052-FDS, 2011 WL 3511518 at *15 n. 8 (D. Mass. Aug. 10, 2011) (citing SSR 96–5p, 1996 WL 374183, at *5 (S.S.A. July 2, 1996)) (noting that "[a]lthough an adjudicator may decide to adopt

all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment"). The conclusion that mild to moderate limitation would not restrict Hargrow to a single two hour period of attention each work day was supported by substantial evidence. 42 U.S.C. § 405(g).

Hargrow also alleges that reliance on Dr. Cole's assessments was improper because Dr. Cole was unable to consider information, including 2011 treatment records and Dr. Dahlben's 2011 opinion, which was added to the record after Dr. Cole completed her assessment. D. 16 at 9. An ALJ evaluates the opinion of a non-examining source by assessing the extent to which it considers all relevant evidence, including opinions of treating or examining sources. 20 C.F.R. § 404.1527(c). "Generally, the more consistent an opinion is with the record as a whole, the more weight [an ALJ] will give to that opinion." Id. Dr. Cole's assessments indicate her consideration of the entire record available to her at the time of the November 2010 assessment, including Hargrow's 2010 Function Report and the 2010 treatment notes from the North Suffolk Mental Health Association. R. 338. The ALJ gave great weight to Dr. Cole's opinions because he found them consistent with his review of the entire record, which included information that was not available to her at the time of her assessments. R. 21. That is, although Dr. Cole did not have Dr. Dahlben's 2011 opinion to consider, the ALJ's conclusion that Hargrow's condition had not substantially changed during the later period in 2011 supported his decision to give great weight to Dr. Cole's opinion as consistent with the record, particularly in light of the little weight he gave to Dr. Dahlben's opinion. R. 21. The ALJ's findings, in light of the entirety of the record, were reasonable and supported by substantial evidence. 42 U.S.C. § 405(g).

2. *The ALJ Did Not Err by Finding That ADHD Was Not a Medically Determinable Impairment*

Hargrow argues that the ALJ's finding that her ADHD was not a medically determinable impairment was reversible error. D. 16 at 2. The ALJ made his determination noting that ADHD had been diagnosed by Ervin, a licensed social worker, in February 2010, but had never been confirmed, diagnosed or treated by Dr. Dahlben. R. 13. As an initial matter, Ervin's diagnosis of ADHD cannot, alone, support the existence of a medically determinable impairment because Ervin is not an "acceptable medical source" "who can provide evidence to establish an impairment" under the SSA Regulations. 20 C.F.R. § 404.1513(a). While her opinion may serve as important "other source" evidence to the extent that it supports evidence provided by an acceptable medical source, the ALJ was not required to give it great weight. See 20 C.F.R. § 404.1513(d); SSR 06–03p, 2006 WL 2329939, at *2.

The ALJ reasonably determined that Hargrow's severe impairments were mood disorder NOS and polysubstance abuse. R. 13. In reaching his findings, the ALJ gave consideration to the treatment notes of Ervin, who had diagnosed ADHD, and Dr. Dahlben, who had not. R 17-20. Notably, he gave great weight to the opinion of Dr. Cole, who did consider Hargrow's alleged ADHD, along with mood disorder and polysubstance dependence, in forming her conclusions. R. 21, 326-42. In light of the ALJ's consideration of the record before him, the determination that ADHD was not a medically determinable impairment was not in error.

3. *The ALJ Did Not Err By Giving Greater Weight to the Opinion of Dr. Cole and Less Weight to the Opinion of Dr. Dahlben*

Hargrow argues that the ALJ erred by rejecting, without reasonable basis, the opinion of her treating medical source in favor of the opinion of a non-examining psychologist. D. 16 at 7-

8. She alleges that the ALJ, while stating that he gave Dr. Dahlben's opinion less weight than that of Dr. Cole, actually gave it no weight at all. D. 16 at 7.

A treating source's medical opinion is to be given controlling weight when the opinion is well-supported by the record and is not inconsistent with other substantial evidence. SSR 96-2p, 2006 WL 2329939 at *1; Clayton v. Astrue, No. 09–10261–DPW, 2010 WL 723780, at *6 (D.Mass. Feb.16, 2010). While the medical opinion of a treating source is generally afforded more weight than that of a non-treating source, an ALJ may properly give less weight to a medical opinion that is inconsistent with the record as a whole or unsubstantiated by treatments notes. 20 C.F.R. § 404.1527(c); See Green v. Astrue, 588 F.Supp.2d 147, 154 (D.Mass.2008); Avery v. Astrue, No. 11-30100-DJC, 2012 WL 4370270, at *10 (D. Mass. Sept. 21, 2012) (explaining that the ALJ may give less weight to a treating source's opinion if it is inconsistent with the record as a whole); Blanchette v. Astrue, No. 08–CV–349–SM, 2009 WL 1652276, at *7 (D.N.H. June 9, 2009) (finding that the ALJ properly gave less weight to a treating source's opinion that was not supported by treatment records or tests).

Because he did not give controlling weight to the opinion of Hargrow's treating source, R. 21, the ALJ was required to explain his decision, giving "good reasons" for the weight afforded to Dr. Dahlben's opinion and his decision to give greater weight to Dr. Cole's opinion. 20 C.F.R. §§ 404.1527, 416.927. Because the ALJ explained that he found Dr. Dahlben's opinion inconsistent with – and Dr. Cole's opinion consistent with – the weight of the record, and because these findings were supported by substantial evidence, there is no error. Id.

While the ALJ gave less weight to Dr. Dahlben's opinion, it is clear from his decision that he considered the 2011 Medical Source Statement of Ability To Do Work-Related Activities

(Mental) form and did not reject the opinion entirely. R. 21. His determination that the opinion was not entitled to controlling or greater weight stemmed from the opinion's inconsistency with other substantial evidence, including the opinion evidence of Dr. Fitzpatrick and Dr. Cole, Hargrow's own testimony and was "not consistent" even with the doctor's own treatment record of Hargrow. SSR 96-2p; R. 21-22; R. 34-44; R. 238-51; R. 326-42. The ALJ explained that, because there was no record of medical treatment between April 2008 and February 2010, he gave little weight to the extension of Dr. Dahlben's opinion back to the alleged on set date of Hargrow's limitations, February 1, 2008. R. 21. Further, The ALJ found that Dr. Dahlben's opinion was also inconsistent with the doctor's own records (and Ervin's records) of treatment from North Suffolk Mental Health Association, which indicated mild to moderate impairment during Hargrow's treatment in 2010 and 2011. Id.; see Nobrega v. Barnhart, No. 05-30204-KPN, 2006 WL 2358886 at *7 (D. Mass. Aug. 3, 2006) (noting that, when the opinion of a treating source is internally inconsistent or based on a claimant's subjective complaints, rather than objective evidence, an ALJ is responsible for weighing it against other objective medical evidence and opinion evidence). The ALJ also cited treatment records demonstrating that, even in the absence of compliance with the treatment and medication regimens during this period, Hargrow's "mental limitations… presented as being moderate in severity at worst" – inconsistent with Dr. Dahlben's opinion. R. 22.

Given the ALJ's reasonable explanations for the weight afforded to the conflicting opinion evidence, the ALJ's determinations were supported by substantial evidence.

#### 4. *The ALJ's Step Five Finding is Supported by Substantial Evidence*

Hargrow argues that the ALJ improperly based his determination on the testimony of a Vocational Expert ("VE") without resolving an inherent conflict between the VE's testimony and the information contained in the DOT. D. 16 at 10. Specifically, Hargrow argues that the VE testified that she would be able to work in capacities requiring an ability to carry out "one-two step instructions," consistent with a General Educational Development ("GED") reasoning level one position, but offered occupations, cafeteria attendant (DOT 311.677-010) and laundry worker (DOT 302.685-010), which are classified under GED reasoning level two, requiring an ability to carry out "detailed but uninvolved" instructions. Id. at 10-11; D. 21 at 5.

The DOT provides standardized occupational information, classifying jobs based on factors such as worker activity, exertion level and skill level. See Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011). The DOT assigns a GED reasoning level to each occupation in the DOT, ranging from a low of one to a high of six. DOT, Fourth Edition, Revised 1991, App. C, 1991 WL 688702. GED reasoning level one corresponds with an ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "deal with standardized situations with occasional or no variables in or from these situations encountered on the job." Id. GED reasoning level two corresponds with the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." Id.

Before relying on the testimony of a VE to support a determination, an ALJ must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [a VE] . . . and information in the Dictionary of Occupational Titles (DOT) . . . and

[e]xplain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4P, 2000 WL 1898704 at *1. If the VE has provided information that is not consistent with the DOT, the ALJ must explain how he resolved the conflict, regardless of how it was identified. Id. at *4.

Courts in this circuit have interpreted SSR 00-4p to require the ALJ to inquire whether a VE's testimony conflicts with the DOT and explain the resolution of any apparent conflict in the decision. See Mead v. Barnhart, No. 04-139-JD, 2004 WL 2580744 at *2-3 (D.N.H. Nov. 15, 2004) (remanding where the ALJ did not ask the VE whether his opinions conflicted with the DOT and failed to explain an apparent conflict in his decision); Wilcox v. Barnhart, No. 03-408-PB, 2004 WL 1733447 at *5 (D.N.H. July 28, 2004) (finding that an ALJ had no reason to believe that a conflict between the VE's testimony and the DOT existed because the VE testified that the source of his testimony related to a job description was the DOT).

The ALJ's first hypothetical question to the VE assumed, along with other limitations, that the person "could understand and remember simple instructions." R. 48-49. The ALJ responded that "[w]ith that profile, I'd be looking at some light, unskilled jobs . . . , one-two step instructions, concentrating for two hours, no significant interaction with coworkers or teamwork and no contact with the public" and some examples of appropriate jobs would be cafeteria attendant and laundry worker. R. 49. After the ALJ asked another hypothetical (altering the prior hypothetical, but not as to instructions), the VE testified that the worker would still be able to perform those jobs. R. 50. Hargrow's counsel then asked the VE some questions about the component of the hypothetical regarding instructions. R. 50. During this part of the examination, the VE testified that both of the jobs he offered have a GED reasoning level of two

as described in the DOT.  R. 56-57.  The VE noted that he was familiar with the positions and

that, in the case of the cafeteria attendant, he had "a lot of experience" with the job function from

his previous work in community mental health.  R. 53.[8]  During that time, he had experience

placing individuals in cafeteria attendant positions and had observed the job function and

performed it himself.  Id.  Noting that both of the jobs he offered were routine positions without

a significant requirement to carry out instructions, the VE testified that even an individual

"markedly limited in their ability to carry out very short and simple instructions" would be able

to perform them.  R. 51.  He characterized the instructions that would be present in the jobs as

"show-and-tell instructions."  Id.  Significantly, he noted that the hypothetical worker's

limitation in ability to "ask questions or request assistance," rather than ability to carry out

instructions, was the potentially problematic characteristic that "could compromise [the

worker's] ability to perform the jobs."  R. 51.

There was no error in the ALJ's reliance on the VE's testimony and no internal conflict in

that testimony for the ALJ to resolve.  First, although the cafeteria attendant position is listed in

the DOT as having a GED reasoning level two, the VE's description of the position, based on his

personal experience, did not include a requirement of understanding or carrying out detailed

instructions.  R. 51.  Further, in response to Hargrow's counsel's question whether "someone

markedly limited in their ability to carry out very short and simple instructions" would be able to

complete the work, the VE testified that, because of the simplicity of the instructions involved,

such a person would be able to perform in the position unless she was unable to ask questions or

---

[8] When evaluating a hypothetical claimant's vocational potential, a VE "may rely on
sources other than the DOT, including [his] own past experience. . ." Ellison v. Comm'r of Soc.
Sec., 101 Fed. App'x 994, 996 (6th Cir. 2004) (citing Barker v. Shalala, 40 F.3d 789, 795 (6th
Cir.1994)).

request assistance in response to, for example, "requests from a supervisory level to change what [she was] doing or fill in, in some basic capacity elsewhere" on the job. R. 51-52. The VE was able to provide more specific information about the job than the DOT, which, significantly, lists the "maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." SSR 00-4p, 2000 WL 1898704, at *3; see R. 53-56. Second, the ALJ began his examination of the VE by asking the VE to acknowledge if his testimony was different from the DOT and he agreed to do so. R. 48. Against the backdrop of this instruction, SSR 00-4p, 2000 WL 1898704 at *1; Weatherbee, 649 F.3d at 570 (determining that an instruction prior to a VE's substantive testimony can be sufficient to meet the requirement of SSR 00-4p while noting that an "inquiry into the consistency of a VE's testimony with the DOT could be rendered inadequate due to its timing in other circumstances"), and the further testimony that ensued about the requirements of the jobs proposed by the VE based upon his experience and their classifications under DOT and national and state surveys, this Court cannot conclude that there was any error here. See Auger v. Astrue, 792 F. Supp. 2d 92, 97 (D. Mass. 2011) (finding no apparent conflict between an individual's limitation to simple and unskilled work and a VE's testimony that the individual could perform a job classified as involving GED reasoning level three).

Third, while the First Circuit has yet to address whether a restriction to simple and routine tasks would preclude an individual from performing jobs with a GED reasoning level of two, some Circuits have found that it does not. See Aho v. Comm'r of Soc. Sec. Admin., No. 10-40052-FDS, 2011 WL 3511518 at *9 (D. Mass. Aug. 10, 2011) (citing Lara v. Astrue, 2008 WL 4927346, at *1 (9th Cir. Nov.19, 2008) (finding that "someone able to perform simple,

repetitive tasks is capable of doing work requiring more rigor and sophistication [than present in Reasoning Level 1 jobs] —in other words, Reasoning Level 2 jobs"); <u>Stokes v. Astrue</u>, 2008 WL 1766788, at *8 (10th Cir. Apr.18, 2008) (finding that a limitation to "simple, repetitive and routine work" is consistent with the demands of reasoning level two and should not be construed as a limitation to reasoning level one jobs); <u>Money v. Barnhart</u>, 2004 WL 362291, at *3 (3d Cir. Feb.25, 2004) (finding that a reasoning level two position "would not contradict the mandate that [a claimant's] work be simple, routine and repetitive")).  Other Circuits have gone further, finding that a limitation to simple and routine tasks does not exclude an individual from employment in a position requiring a GED reasoning level of three.  <u>See Aho</u>, 2011 WL 3511518 at *9 (citing <u>Terry v. Astrue</u>, 580 F.3d 471, 478 (7th Cir.2009) (finding no conflict because claimant exhibited an ability to follow simple instructions); <u>Hillier v. S.S.A.</u>, 486 F.3d 359, 367 (8th Cir.2007) (finding no conflict because the  individual's prior work history indicated an ability to perform in a reasoning level three position)).

Judges in this district have previously determined that an individual limited to "simple, unskilled tasks" is not excluded from a position requiring GED reasoning levels of two or three. <u>See</u> <u>Lafrennie v. Astrue</u>, No. 09-40143-FDS, 2011 WL 1103278 at *8 (D. Mass. Mar. 23, 2011); <u>Auger</u>, 792 F. Supp. 2d at 97.  In both <u>Lafrennie</u> and <u>Auger</u>, this Court has recognized that the Social Security regulations and DOT standards used to assess a claimant's ability to understand, remember and carry out directions do not directly align, and that the terms "simple" and "detailed" do not necessarily function in the same way in each.  <u>See id.</u> (citations omitted). While Social Security regulations differentiate jobs involving "short and simple" instructions from those involving "detailed" ones, the DOT distinguishes an individual's ability to understand

and carry out instructions on the more graduated GED reasoning scale, ranging from level one to six.  See id.  That is, the "detailed but uninvolved" qualification of GED reasoning level two does not necessarily indicate the need for a high level of reasoning.  See Lafrennie, 2011 WL 1103278 at *8 (citing Meissl v. Barnhart, 403 F. Supp. 2d 981, 985 (C.D. Cal. 2005)).

In this case, the VE responded to the ALJ's hypothetical described an individual capable of engaging in "light, unskilled work" involving the ability to "understand and remember simple instructions," by proffering jobs classified under the DOT with reasoning level 2.  That is, the VE's testimony revealed no apparent conflict that the ALJ was obligated to resolve in his decision.  See SSR 00–4p.  The VE's testimony and the evidence that Hargrow's ability to remember and carry out detailed instructions would be only moderately limited supported the ALJ's conclusion that Hargrow would be able to perform the jobs identified, even if presented with detailed but uninvolved instructions, undermining the argument that an apparent conflict existed that the ALJ needed to resolve before rendering his decision.  R. 340-42; See Auger, 792 F. Supp. 2d at 97-98; Lafrennie, 2011 WL 1103278 at *8.  Accordingly, there was no error.

## V.    Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Hargrow's motion to reverse is DENIED.


**So ordered.**

/s/ Denise J. Casper
United States District Judge